## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

———————————————————————————————————————————

United States of America,

            Plaintiff,                    **Criminal No. 15-224 (PJS/SER)**

v.

Brian Peter McQuillan,               **<u>REPORT & RECOMMENDATION</u>**

            Defendant.

———————————————————————————————————————————

     Surya Saxena, Esq., United States Attorney's Office, Minneapolis, Minnesota, for Plaintiff.

     Robert E. Oleisky, Esq., Oleisky & Oleisky, PA, Minneapolis, Minnesota, for Defendant.

———————————————————————————————————————————

STEVEN E. RAU, United States Magistrate Judge

     The above-captioned case comes before the undersigned on Defendant Brian Peter McQuillan's ("McQuillan") Motion to Suppress Physical Evidence [Doc. No. 25], Motion to Suppress Statements [Doc. No. 26], Motion to Suppress Evidence Based on the Search Warrant [Doc. No. 33], and Motion for a *Franks* Hearing [Doc. No. 44]. This matter was referred for the resolution of the issues raised in McQuillan's motions pursuant to 28 U.S.C. § 636(b)(1)(B)–(C) and District of Minnesota Local Rule 72.1. For the reasons stated below, the Court recommends that the motions be denied.

## I.    BACKGROUND

     On August 11, 2015, McQuillan was indicted on one count of conspiracy to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846, and one count of possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). (Indictment) [Doc. No. 14].

McQuillan filed his motions to suppress on August 19, 2015, and September 8, 2015, and filed his Motion for a *Franks* Hearing on September 15, 2015. The Court held a hearing on the motions on September 22, 2015. (Minute Entry Dated Sept. 22, 2015) [Doc. No. 47]. Three witnesses testified on behalf of the Government: Officer Chris Nybeck ("Officer Nybeck"), Officer Timothy Fletcher ("Officer Fletcher"), and Officer Heather Olson ("Officer Olson"). (Ex. & Witness List) [Doc. No. 48]. The Court received into evidence two exhibits. (*Id.*). Government's Exhibit 1 is the application for search warrant (including the supporting affidavit), search warrant, and inventory for the search challenged in the Motion to Suppress Evidence Based on the Search Warrant and at issue in McQuillan's Motion for a *Franks* Hearing. (*Id.*). Government's Exhibit 2 is an audio recording of an interview of Heather Feldmann that was conducted at the residence that was searched.[1] (*Id.*). After supplemental briefing from the parties, McQuillan's motions to suppress and Motion for a *Franks* Hearing were taken under advisement on October 29, 2015. *See* (Text Only Order Dated Oct. 20, 2015) [Doc. No. 61].

## II.    FACTS

On July 15, 2015, Officer Nybeck was coordinating a narcotics investigation that involved a cooperating defendant ("CD"). (Tr. Dated Sept. 25, 2015, "Tr.") [Doc. No. 53 at 11]. Earlier in the day, the CD was arrested with one pound of methamphetamine. (*Id.* at 12). Officer Nybeck did not have past experience working with this CD, but immediately upon his arrest, the CD informed officers that he "wanted to cooperate and provide information regarding his source of supply." (*Id.* at 12, 38). The CD told Officer Nybeck that he obtained methamphetamine at 3836 Portland Avenue South in Minneapolis, Minnesota and showed Officer Nybeck "a text

---

[1]     It appears that Heather Feldmann is McQuillan's girlfriend. (Aff. of Heather Jane Feldmann, "Feldmann Aff.") [Doc. No. 45 ¶ 2].

message on his phone that had the same address."[2] (*Id.* at 11, 12, 13). Officer Nybeck drove to

the address and asked the CD to identify the residence from the street and alley. (*Id.* at 13).

Officer Nybeck obtained information from the CD at various points following his arrest.

*See* (Gov't's Ex. 1 at 3–4).[3] The CD informed Officer Nybeck that he had gone to the residence

on multiple occasions to obtain methamphetamine and described the process typically followed

during those transactions. (Tr. at 13). In the past, the CD would send a text message or make a

---

[2]     3836 Portland Avenue South and 3838 Portland Avenue South are part of an "up/down duplex" with 3836 being the lower unit and 3838 being the upper unit. (Gov't's Ex. 1 at 5). It appears from the record that much of the information received by officers in the course of their investigation was regarding "3836 Portland Avenue," although at other points in the record it appears officers received information about "3838 Portland Avenue." *Compare* (*id.* at 3) (stating that the CD showed officers a text message identifying the residence where he obtained methamphetamine as "3836 Portland Avenue S.") *with* (Tr. at 12–13) (stating that the CD "identified an address off of Portland Avenue South" and "showed [officers] through a text message . . . 'the same address'" and that officers then drove with the CD to "this address" at "3838 Portland Avenue South"). Based on the search warrant application, search warrant, and inventory, officers ultimately entered "3838 Portland Avenue South" to conduct a "freeze" and obtained a search warrant for "3838 Portland Avenue South." (Gov't's Ex. 1 at 1, 5, 7–10). This was based on information obtained from a previous arrest of McQuillan in July 2014, and officers' belief that the 3836 address was being used to "disguise the true address of the narcotics storage location." *See* (*id.* at 5). There was no testimony regarding whether there are separate or shared entrances to the units, nor was there testimony regarding the extent to which the two units are otherwise physically separated. Neither McQuillan nor the Government clearly or consistently distinguishes between the two addresses; rather, the parties refer generally to "the residence." *See, e.g.*, (Mem. in Supp. of Mot. to Suppress, "Mem. in Supp.") [Doc. No. 55 at 7] (referring to officers' entry into "the residence"); (Gov't's Post-Hr'g Resp. to Def.'s Mots. to Suppress and for a *Franks* Hr'g, "Mem. in Opp'n") [Doc. No. 59 at 14] (referring generally to the "Portland Avenue residence"). Moreover, none of McQuillan's arguments can be construed as challenging the constitutionality of officers' actions based on an inconsistency between the address about which information was received and the location that was ultimately entered and searched. *See generally* (Mem. in Supp.); (Reply Br. to U.S. Atty's Br., "Reply") [Doc. No. 63]. In describing the relevant facts, the Court refers to 3836 or 3838 Portland Avenue when a particular address is specified in the record, but, like the parties, will use the term "residence" or the "Portland Avenue residence" when no particular address is specified or consistently used.

[3]     As noted, Government's Exhibit 1 is the application for search warrant (including the supporting affidavit), search warrant, and inventory for the search challenged in the Motion to Suppress Evidence Based on the Search Warrant and at issue in McQuillan's Motion for a *Franks* Hearing. The Court has assigned page numbers one through ten to the pages in Government's Exhibit 1 and refers to the relevant pages accordingly.

phone call to a third-party, Cory Taylor ("Taylor"), who would notify an individual known as "Junior" that the CD was coming to the residence to obtain methamphetamine. (*Id.* at 14, 18–19). "[I]f a successful negotiation . . . [to] get methamphetamine from th[e] residence occurred," the CD would drive to the alley and park behind the house. (*Id.* at 14); *see also* (*id.* at 19). The transaction between Junior and the CD would then occur in the alley. (*Id.* at 18). Junior "would exit from the garage or fence for this address with the requested crystal methamphetamine, place it into the rear of [the CD's] vehicle and then approach [the CD] to receive the money." (Gov't's Ex. 1 at 3). The CD further informed Officer Nybeck that Junior was "a light-skin[ned] Hispanic male, skinny, short hair." (Tr. at 13). The CD also "identified another narcotics trafficker," Taylor's girlfriend, and the general location of a "stash house" used by Taylor and his girlfriend. (*Id.* at 39); (Gov't's Ex. 1 at 3). This information was consistent with information that Officer Nybeck was already aware of based on previous investigations.[4] (Tr. at 39); (Gov't's Ex. 1 at 3). The CD informed officers that he had been in communication with Taylor "that day regarding [the CD] obtaining approximately two pounds of crystal methamphetamine at the 3836 Portland Ave. S address," and officers "personally observed text messages between" Taylor and the CD regarding 3836 Portland Avenue South as well as text messages that "indicated that [the CD] was to again obtain crystal methamphetamine from this address and 'Junior.'" (Gov't's Ex. 1 at 4).

Officers directed the CD to contact Taylor, and Taylor told the CD to go to 3836 Portland Avenue—"his boy's house" and "wake him up." (Tr. at 23–24); *see also* (*id.* at 31). The CD had attempted to directly contact Junior at the address, but was unsuccessful, and there was nothing to suggest that Junior knew that the CD would be coming to the residence. (*Id.* at 31–32). With

---

[4]     The CD also identified Taylor and his girlfriend "through their current Facebook pictures." (Gov't's Ex. 1 at 4).

surveillance teams in place, the CD went to the front door at 3836 Portland Avenue, and spoke with an individual believed to be Junior. (*Id.* at 14).

Officers conducting surveillance observed the individual as he spoke to the CD. (*Id.* at 32). The conversation between the CD and the individual ended, and the CD gave officers a "thumbs up" indicating that he had succeeded in setting up a narcotics transaction. (*Id.* at 16, 32). In addition, Officer Nybeck had previously instructed the CD that if he was successful in arranging a deal for narcotics, he should "go to the rear of the house like . . . during [a] typical deal[]." (*Id.* at 32). If he was unsuccessful, the CD was to call Officer Nybeck. (*Id.*). The CD proceeded to his vehicle, drove to the rear of the residence, and parked his vehicle directly behind the garage. (*Id.* at 14, 15–17). "The same individual that was at the front of the house appeared at the rear of the house" and approached the CD's vehicle. (*Id.* at 15). The individual and the CD communicated for a second or two. (*Id.* at 35). Officers then approached and arrested the individual and the CD. (*Id.* at 15). Officers identified the individual as the "Junior" that the CD previously told them about, and identified "Junior" as McQuillan. (*Id.*). An officer searched McQuillan twice, but found no methamphetamine on his person. (*Id.* at 19). Officers did find approximately $3,000 to $6,000 dollars in McQuillan's pockets.[5] (*Id.* at 20). Officer Nybeck then asked McQuillan about "some biographical information," but McQuillan's speech seemed "slow and slurred." (*Id.*). Officer Nybeck also noted "a large cut" on McQuillan's head, so he discontinued the conversation and made sure that McQuillan received medical attention. (*Id.* at 20–21).

Having understood, based on the CD's conduct and the events that had unfolded, that McQuillan had agreed to provide the CD with methamphetamine, Officer Nybeck asked the CD

---

[5]    Officer Nybeck could not recall the exact amount of currency that was found on McQuillan, but thought that it was more than $2,100. (Tr. at 37).

why officers had not found any methamphetamine on McQuillan. (*Id.* at 19–20, 38). The CD told Officer Nybeck that when McQuillan approached the CD's vehicle in the alley, McQuillan asked the CD, for a second time, how many pounds of methamphetamine the CD wanted. (*Id.* at 19–20). That is, the CD implied that McQuillan had forgotten about the "quantity talked about at the front of the house and approached the vehicle at the rear of the house to ask how many pounds he wanted, again." (*Id.* at 38); *see also* (*id.* at 36).

Based on the two reported conversations between McQuillan and the CD regarding the provision of "pounds of meth" by McQuillan, Officer Nybeck instructed other officers "to enter the residence of 3838 and freeze the residence so [he] could . . . go and apply for a search warrant." (*Id.* at 25, 38). Officer Nybeck was concerned that someone inside the residence could see and hear what they were doing, and the officers were "overt," in that they had announced their presence as police officers and were wearing clothing identifying them as police officers. (*Id.* at 21–22, 48). There were windows in the home as well as "video cameras attached to the garage" stating "something to the effect of: Smile, you are on camera." (*Id.* at 22–23, 49). Officer Nybeck concluded that the cameras would be tied to "a monitor somewhere," and that the "monitors could be in the house." (*Id.* at 23). Officer Nybeck also observed a vehicle parked near the garage of the residence, and was aware that setting up the transaction between McQuillan and the CD had involved Taylor, whose whereabouts were unknown. (*Id.* at 22, 23–24). Officers were concerned that there could be someone inside the house with weapons, posing a danger to officers, and that if someone was inside the house, they would be able to determine that law enforcement was present and might destroy evidence. (*Id.* at 25, 49). Officer Nybeck testified that the "freeze" was therefore conducted in order to ensure officer safety and to ensure that items of evidentiary value would not be destroyed. (*Id.* at 25).

At approximately 6:30 p.m. officers made an entry into the residence to conduct the freeze. (*Id.* at 29). Officer Fletcher was present at this time and was part of the team that entered the house and conducted the freeze. (*Id.* at 46–47). Officer Fletcher testified that no other officers entered the residence before he arrived at the scene, and that the back door of the residence was partially open. (*Id.* at 47–48). Officer Fletcher was instructed to clear the residence to ensure no one was inside, detain any individuals found inside the home, and freeze the scene. (*Id.* at 49). In conducting this "sweep and . . . freeze," Officer Fletcher entered the back door of the residence and went into the southwest bedroom.[6] (*Id.* at 50). The closet door in the bedroom was partially open, and Officer Fletcher could see inside part of the closet. (*Id.* at 51). Officer Fletcher noticed "a pile of clothes, and on top of that . . . was a black duffel bag. That duffel bag was unzipped." (*Id.*). From where he was standing, Officer Fletcher observed multiple duct-taped objects inside the bag that appeared to be packaged narcotics. (*Id.* at 51, 57). Officer Fletcher specifically testified that he did not touch, move, or unzip the bag or open the closet. (*Id.* at 52). Officer Fletcher informed another agent at the scene of what he observed in the southwest bedroom and then left the residence to "clear" the garage. (*Id.* at 53). Officer Fletcher observed approximately one-half pound of cocaine when clearing the garage. (*Id.* at 58). After clearing and freezing the garage, Officer Fletcher left the scene. (*Id.* at 55).

At some point officers informed Officer Nybeck that "there was something inside [he] needed to see." (*Id.* at 26). Officer Nybeck entered the residence and was directed to the southwest bedroom where he observed a "black nylon bag that was laying on a heap of clothes kind of half in and half out of a closet in that bedroom." (*Id.*). The bag was "semi-open," and was

---

[6]     In his testimony regarding "the southwest bedroom," Officer Fletcher did not specify if this was a bedroom in the upper or lower unit of the Portland Avenue residence. *See* (Tr. at 50, 56). The application for the search warrant, however, clarifies that officers entered the upper unit, placing the "southwest bedroom" in the upper unit. *See* (Gov't Ex. 1 at 5).

open enough so that Officer Nybeck could see inside of the bag. (*Id.*). Officer Nybeck saw "at least one or two large cylinder-like objects" that appeared to be wrapped in black electrical tape inside the bag. (*Id.* at 27). Based on his training and experience, Officer Nybeck knew that this is how narcotics, such as methamphetamine, are packaged in pound quantities. (*Id.*). Officer Nybeck then left the premises to apply for a search warrant.[7] (*Id.* at 27–28).

The search warrant application recounted the information officers obtained from the CD and officers' related investigative efforts, the observations made during the course of surveillance at the Portland Avenue residence, and the circumstances surrounding McQuillan's arrest. (Gov't's Ex. 1 at 3–5). The application also stated that officers had entered "the top unit" at the Portland Avenue residence to conduct a "freeze," and noted that officers "detected the distinct odor of marijuana inside the residence and what appeared to be a large amount of crystal methamphetamine" in a black duffel bag. (*Id.* at 5). In addition, the warrant stated that "[o]fficers entered the 3838 unit based upon McQuillan being arrested in July 2014" on "a warrant by the Minneapolis PD" and that Officer Nybeck believed that Taylor "texted the address of 3836 to [the CD] earlier in an attempt to disguise the true address of the narcotic's storage location." (*Id.*). Hennepin County District Court Judge Patrick Robben signed a warrant for the premises at "3838 Portland Ave S," including "[a]ll garages, vehicles, and storage units under the control of

---

[7]     While a warrant was being sought, Feldmann arrived at the residence. (Tr. at 62–63). Feldmann's three minor children were found in the residence during the sweep and were kept in the "living area" with officers. (*Id*. at 40, 53). Officers told Feldmann she was not free to leave and ultimately took Feldmann into the southwest bedroom to conduct an interview. (*Id.* at 63–64, 66). Feldmann waived her *Miranda* rights, and officers asked her "whether she kept her property in . . . the southwest bedroom," where officers had observed the duffel bag containing what appeared to be packaged narcotics. (*Id.* at 64, 66). Feldmann stated that most of the items in the room belonged to her boyfriend. (*Id.* at 67). Officers talked to Feldmann about the duffel bag, and when Feldmann started to reach toward to the bag, "kind of starting to look through it," officers instructed her to stop. (*Id.* at 68–69). Following the interview, officers told Feldmann she could leave the premises with her children and that she would be contacted after the execution of the search warrant. *See* (*id.* at 69).

individuals found inside this address." (*Id.* at 7). Officers subsequently executed the search warrant, which led to the seizure of evidence, including several pounds of suspected methamphetamine, digital scales, suspected cocaine, and various amounts of United States currency. (Gov't Ex. 1 at 8–10).

## III.   DISCUSSION

### A.   Motion to Suppress Physical Evidence, Motion to Suppress Evidence Based on the Search Warrant, and Motion for a *Franks* Hearing

McQuillan appears to seek suppression of evidence on the following grounds: (1) Officers lacked probable cause to arrest him; (2) Officers unlawfully entered the residence following his arrest because they did not have a warrant or consent to enter and no exigent circumstances justified a warrantless entry; (3) Officers unlawfully expanded the scope of the freeze of the residence by "continu[ing] to search" the southwest bedroom and "finding the black duffel bag half in and half out of the closet"; and (4) The search warrant lacked probable cause and contained intentional and/or reckless misrepresentations of material fact. (Mem. in Supp. at 5–10); *see also* (Reply).

### 1.   Arrest[8]

---

[8]      In his initial post-hearing brief, McQuillan identified his first challenge as a challenge to probable cause for the issuance of the search warrant, but primarily discussed the facts and circumstances surrounding his arrest. *See* (Mem. in Supp. at 5–6). In response, the Government treated this as an argument that officers lacked probable cause to arrest McQuillan. (Mem. in Opp'n at 9–13). In his Reply, McQuillan addresses the issue of probable cause to support his arrest, without stating whether this was in fact the argument he intended to make in his initial brief. (Reply at 1–2). Because both parties have discussed whether there was probable cause to arrest McQuillan, the Court will consider the issue. The Court notes, however, that McQuillan's arguments are haphazard despite the Court's specific emphasis at the motion hearing on the importance of clearly identifying the issues for decision in post-hearing briefing. *See* (Tr. at 8). In fact, McQuillan states in his Motion to Suppress Physical Evidence that he seeks suppression of "any physical evidence obtained as a result of the search of [his] person on the grounds that the search violated his Fourth Amendment right to be free from unreasonable searches and seizures." (Mot. to Suppress Physical Evid. at 1). In his post-hearing briefing, however, he makes

a.      **Legal Standard**

Consistent with the Fourth Amendment, law enforcement may conduct a warrantless arrest "when there is probable cause to believe that someone has committed or is committing a crime." *United States v. Winarske*, 715 F.3d 1063, 1066 (8th Cir. 2013). "'To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.'" *Id.* (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)); *see also United States v. Wentz*, 686 F.3d 653, 656 (8th Cir. 1982). Information available to officers at the time of arrest need only establish the "the mere 'probability or substantial chance of criminal activity, rather than an actual showing of criminal activity.'" *Winarske*, 715 F.3d 1067 (quoting *United States v. Mendoza*, 421 F.3d 663, 667 (8th Cir. 2005)). That is, law enforcement officers "are not required to witness actual criminal activity or have collected enough evidence so as to justify a conviction for there to be a legitimate finding of probable cause to justify a warrantless arrest." *Id.* In addition, officers have "substantial latitude in interpreting and drawing inferences from factual circumstances" when determining whether there is probable cause to arrest. *See id.* (internal quotation marks omitted).

When officers base their decision to make a warrantless arrest on information provided by an informant, "the informant's reliability, veracity, and basis of knowledge are relevant to whether" probable cause existed to support the arrest. *See United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005). The credibility and reliability of the informant are important factors for

---

no argument challenging the **search** of his person. *See generally* (Mem. in Supp.); (Reply). The Court construes McQuillan's belated argument regarding the lawfulness of his arrest to be the basis for his Motion to Suppress Physical Evidence, but does not separately consider the lawfulness of any search of McQuillan's person incident to that arrest, as McQuillan has not separately challenged this search.

determining probable cause, but they are not separate and independent requirements from the totality-of-the-circumstances approach. *United States v. LaMorie*, 100 F.3d 547, 553 (8th Cir. 1996); *see Illinois v. Gates*, 462 U.S. 213, 230 (1983). "Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of supplying reliable information, or if it is corroborated by independent evidence." *United States v. Mims*, 567 F. Supp. 2d 1059, 1067–68 (D. Minn. 2008) (Mayeron, Mag. J., *as adopted by* Rosenbaum, J.) (citing *United States v. Williams*, 10 F.3d 590, 594 (8th Cir. 1993)). In determining whether information is reliable, the Eighth Circuit noted that "there are indicia of reliability in the richness and detail of a first hand observation" and that "[s]tatements against the penal interest of an informant typically carry considerable weight in establishing reliability." *United States v. Buchanan*, 574 F.3d 554, 561–62 (8th Cir. 2009) (alteration in original) (internal quotation marks omitted). Lastly, "[t]he circumstances of personal questioning may also enhance reliability and credibility," *Buchanan*, 574 F.3d at 562, as in-person questioning provides law enforcement with an opportunity to "assess the credibility of [a] confidential informant[]." *United States v. Neal*, 528 F.3d 1069, 1074 (8th Cir. 2008).

### b.      Analysis

The Court concludes that officers had probable cause to arrest McQuillan. At the time of McQuillan's arrest, officers received information from the CD that he obtained methamphetamine numerous times from an individual at the Portland Avenue residence. (Tr. at 11–13); (Gov't Ex. 1 at 3–4). The CD, who was arrested earlier that day with a pound of methamphetamine, told officers that he would typically contact a third party, Taylor, who would notify an individual known as "Junior" that the CD was coming to the residence to obtain methamphetamine. (Tr. at 14, 18–19). These communications occurred via text message or

phone call. (*Id.*). Once an agreement was reached for the CD to obtain methamphetamine from the Portland Avenue residence, he would drive to the alley and park behind the residence where the transaction would occur. (*Id.* at 14, 19).

Officers viewed text messages from Taylor on the CD's phone that referenced the Portland Avenue residence, and in a coded manner, discussed the CD obtaining methamphetamine from the residence. *See* (Tr. at 11–13, 24); (Gov't's Ex. 1 at 3–4). In addition, consistent with information that officers already knew based on prior investigations, the CD accurately identified Taylor's girlfriend as another narcotics trafficker in the area and the general location of a "stash house" used by Taylor and his girlfriend. (Tr. at 39); (Gov't's Ex. 1 at 3). The CD also identified Taylor and his girlfriend "through their current Facebook pictures" and travelled to the Portland Avenue residence with officers to identify it from the street and alley. (Tr. at 13); (Gov't's Ex. 1 at 3–4).

The CD continued contact with Taylor at the direction of law enforcement, and was instructed to go to 3836 Portland Avenue and wake up "Junior" (i.e., McQuillan). (Tr. at 23–24); (Gov't's Ex. 1 at 4). While under surveillance, the CD went to the front door at 3836 Portland Avenue and spoke with McQuillan. (Tr. at 14). Consistent with the CD's past successful narcotics dealings at the residence, the CD then drove to the rear of the residence and parked his vehicle directly behind the garage.[9] (*Id.* at 14, 15–17). McQuillan then "appeared at the rear of the house" and approached the CD's vehicle. (*Id.* at 15). McQuillan and the CD communicated for a second or two, and officers moved in to arrest both men. (*Id.* at 35).

---

[9]     This was also consistent with Officer Nybeck's instruction to the CD that if he was successful in arranging a narcotics deal, he should drive to the rear of the residence like "during [a] typical deal." (*Id.* at 32). And while not instructed by officers to do so, the CD also indicated that he had successfully arranged a narcotics deal by giving officers a "thumbs up." (*Id.* at 16).

Essentially, at the time of McQuillan's arrest, officers had information from a cooperating individual, who had demonstrated knowledge of narcotics trafficking in the area, that he had obtained methamphetamine from someone at the Portland Avenue residence in the past. Officers observed communications between the CD and Taylor that were consistent with the CD's description of past arrangements to obtain narcotics at the residence and that demonstrated that another arrangement to obtain narcotics would be made that day. Officers conducted surveillance that demonstrated the CD had successfully arranged for the individual at the Portland Avenue residence to bring him narcotics in the alley, and officers observed McQuillan approaching the CD's vehicle in the alley. These facts were sufficient to establish probable cause to believe that McQuillan had committed or was committing a crime. *Winarske*, 715 F.3d at 1066.

McQuillan primarily contends that officers lacked probable cause to arrest him because the CD was not sufficiently reliable. (Mem. in Supp. at 5–6); *see also* (Reply at 1–3). McQuillan's contentions fail to account for the appropriate legal standard applied when determining the reliability of an informant. Even where an informant does not have a history of working with law enforcement to establish his reliability, information provided by an informant may be deemed reliable when it is corroborated by independent evidence. *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993).

Here, the information the CD provided to officers about his past arrangements for narcotics dealings at the Portland Avenue residence was corroborated in part by officers' personal observation of text messages between the CD and Taylor and by the events that surveillance officers observed when the CD went to the Portland Avenue residence on July 15, 2015. Specifically, the text messages referenced the Portland Avenue residence and discussed the

CD obtaining methamphetamine from the residence in a coded manner, and, consistent with the CD's description of past dealings at the Portland Avenue residence, the CD parked in the alley where McQuillan approached his vehicle. (Tr. at 11–13, 24); (Gov't's Ex. 1 at 3–5); *see United States v. Parish*, 606 F.3d 480, 486–87 (8th Cir. 2010) (finding probable cause to arrest where officer spoke to informant in person, listened to phone conversations in which the informant arranged a "drug deal" with the defendant, the informant's description of the defendant's vehicle and the timing and location of the deal were corroborated, and defendant attempted to flee when officers approached his vehicle); *see also United States v. May*, 440 F. Supp. 2d 1016, 1040–41 (D. Minn. 2006) (Erickson, Mag. J., *as adopted by* Kyle, J.) (concluding officer "reasonably relied upon the information . . . obtained from a cooperating [d]efendant, because the information was given against the cooperating defendant's own penal interest" and because information was corroborated by officer "locat[ing] a text message on the cooperating defendant's cellular phone confirming communications regarding the methamphetamine organization" and use of code words).

The CD also identified another known narcotics trafficker and accurately identified the location of a known stash house. (Tr. at 39); (Gov't's Ex. 1 at 3, 4). While these matters are not directly connected to the CD's knowledge of McQuillan's involvement in criminal activity, the fact that the CD provided officers with information about methamphetamine trafficking that officers already knew to be true based on previous investigations verifies the CD's involvement with illegal narcotics activity and demonstrates his truthfulness, supporting a general inference of credibility. *Cf. United States v. Warford*, 439 F.3d 836, 842 (8th Cir. 2006) (noting that although police independently verified information that "did not pertain directly to the alleged criminal

activity under investigation" the verification nonetheless "enhanced the general credibility of the sources").

In addition, the CD provided information to officers during in-person questioning and made statements against his penal interest when he provided extensive information to officers regarding his prior illegal narcotics activity. *See* (Tr. at 13); (Gov't's Ex. 1 at 4). The CD's information was also based on his first-hand accounts of prior dealings with McQuillan. *See* (Tr. at 13, 18–19); (Gov't's Ex. 1 at 3–4). All of the above circumstances further establish the CD's reliability and credibility. *Buchanan*, 574 F.3d at 561–62 (noting the indicia of reliability inherent in first-hand observations and that statements made against an informant's penal interest "carry considerable weight in establishing reliability"); *Neal*, 528 F.3d at 1074 (noting that in-person questioning provides officers with an opportunity to assess the informant's credibility).

On reply, McQuillan attempts to demonstrate the CD's lack of credibility by stating that "a basic quick check of the CD's criminal record would reveal that he has a history of lying to law enforcement" and that "[w]e . . . know that there was a tracking device that had been on the CD's vehicle for two weeks prior to the July 15, 2015 arrest, yet we have no records of the CD making any trips to McQuillan's residence during that time period." (Reply at 2). McQuillan's assertions as to the CD's criminal record and the use of a tracking device on the CD's vehicle have no factual support in the record. McQuillan did not elicit testimony on either of these matters, nor did he offer any documentary evidence to establish a factual basis for these assertions. *See generally* (Tr.); (Ex. & Witness List). Without any evidence in the record to support these assertions, McQuillan's arguments must fail.

McQuillan also argues that officers lacked probable cause to arrest him because officers did not observe a transaction involving the exchange of drugs or money. (Mem. in Supp. at 5–6);

15

*see also* (Reply at 1–3). This argument is unpersuasive. As noted above, officers "are not required to witness actual criminal activity or have collected enough evidence so as to justify a conviction for there to be a legitimate finding of probable cause to justify a warrantless arrest." *Winarske*, 715 F.3d at 1067. For the reasons stated above, the information available to officers at the time of McQuillan's arrest established the "'probability or substantial chance of criminal activity" even if that information did not constitute "an actual showing of criminal activity'"; the former is all that is required for probable cause. *Id.* (quoting *United States v. Mendoza*, 421 F.3d 663, 667 (8th Cir. 2005)).

In sum, the information gathered and the events leading up to McQuillan's arrest, viewed from the standpoint of an objectively reasonable police officer, amounted to probable cause. Accordingly, officers' warrantless arrest of McQuillan was lawful, and the Court recommends denial of the Motion to Suppress Physical Evidence. *See supra* note 8.

### 2. Probable Cause

McQuillan next argues that officers unlawfully entered the Portland Avenue residence following his arrest because they did not have a warrant or consent to enter and no exigent circumstances justified a warrantless entry, and that officers unlawfully expanded the scope of the "freeze" of the residence by "continu[ing] to search" the southwest bedroom where they found the black duffel bag containing suspected methamphetamine. (Mem. in Supp. at 6–9); (Reply 3–4). Information obtained from this allegedly unlawful conduct was included in the search warrant, which therefore, McQuillan argues, requires suppression of "any evidence seized from McQuillan's residence." (Mem. in Supp. at 10). "The Fourth Amendment generally prohibits police from entering a home without a warrant unless the circumstances fit an established exception to the warrant requirement," such as the exigent circumstances exception.

*United States v. Khabeer*, 410 F.3d 477, 482–83 (8th Cir. 2005); *United States v. Johnson*, Criminal No. 06-392 (JRT/JJG), 2007 WL 1501301, at *8 (D. Minn. May 21, 2007) (Graham, Mag. J., *as adopted by* Tunheim, J.) (citing *United States v. Amburn*, 412 F.3d 909, 915 (8th Cir. 2005)). The Court need not decide, however, whether there were exigent circumstances here, because the independent source doctrine permits admission of the evidence seized from McQuillan's residence. *Khabeer*, 410 F.3d at 483; *see also Johnson*, 2007 WL 1501301, at *9– 10; (Mem. in Opp'n at 19) (arguing evidence is admissible pursuant to independent source doctrine).

### a.    Legal Standard

"The independent source doctrine provides that evidence initially discovered during an unlawful search, but later obtained independently through activities untainted by the illegality, may be admitted into evidence." *Khabeer*, 410 F.3d at 483 (citing *Murray v. United States*, 487 U.S. 533, 537 (1988)). The rule is "rooted in the view that 'the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred.'" *Id.* (quoting *Nix v. Williams*, 467 U.S. 431, 443 (1984)).

> To establish that the independent source doctrine applies to evidence seized pursuant to a warrant obtained after an unlawful entry to a home, the government must show both (1) that the decision to seek the warrant was independent of the unlawful entry—i.e., that police would have sought the warrant even if the initial entry had not occurred—and (2) that the information obtained through the unlawful entry did not affect the magistrate's decision to issue the warrant.

*Id.* (citing *Murray*, 487 U.S. at 542). Stated differently, the Court must consider "whether the police would have applied for a warrant had they not made the prior illegal observations" and "whether removing the tainted information also removes the basis for probable cause." *United*

*States v. Swope*, 542 F.3d 609, 614 (8th Cir. 2008). Probable cause exists when the likelihood of finding evidence of a crime in a certain place is fairly probable. *United States v. Chrobak*, 289 F.3d 1043, 1046 (8th Cir. 2002). "Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant . . . ." *United States v. Summage*, 481 F.3d 1075, 1078 (8th Cir. 2007) (internal quotation marks omitted). Determining whether probable cause exists is a practical, common sense decision. *Mims*, 567 F. Supp. 2d at 1067.

### b.   Analysis

The Court first considers whether officers would have applied for a warrant had they not made the observations they made during their initial entry, which the Court assumes for the purposes of analysis was unlawful. *See Swope*, 542 F.3d at 614. Officer Nybeck testified that after the arrests of McQuillan and the CD were completed, he "instructed the officers that were assisting to enter the residence of 3838 and freeze the residence so [he] could . . . go and apply for a search warrant." (Tr. at 25); *see also* (Gov't's Ex. 1 at 5) (stating that officers conducted a protective sweep "for the purpose of 'freezing'" the residence "prior to obtaining a search warrant"). Thus, the record demonstrates that officers were already planning to obtain a search warrant before their initial entry, and the Court finds that officers would have obtained a search warrant regardless of the observations made during that entry. *See United States v. Brooks*, 715 F.3d 1069, 1075–76 (8th Cir. 2013) (considering agent's testimony regarding what prompted officers to apply for a search warrant in determining whether "the police would have applied for the warrant even without the information from the initial search").

The Court must next consider whether, after redacting observations made during officers' initial warrantless entry, the remaining allegations in the search warrant application support a

finding of probable cause. *See Swope*, 542 F.3d at 616; *Khabeer*, 410 F.3d at 483. To answer this question, the Court redacts the information that officers' obtained based on their initial entry: Officers' detection of a "distinct odor of marijuana inside the residence" and officers' observation of the black duffel bag that appeared to contain packaged methamphetamine. *See* (Gov't's Ex. 1 at 5). Even after redacting this information from the search warrant, the search warrant application supports a finding of probable cause.

The search warrant application provides that officers had information from the CD, who had demonstrated knowledge of narcotics trafficking in the area, that he had obtained methamphetamine from someone at 3836 Portland Avenue South.[10] (*Id*. at 3–4). Officers observed communications between the CD and Taylor that were consistent with the CD's description of past arrangements to obtain narcotics at the residence and that demonstrated that another arrangement to obtain narcotics could be made that day. (*Id.*). The search warrant application also notes that officers observed a camera on the garage behind the residence with the "hand written statement on the fence gate that stated '[s]mile your [sic] on camera,'" which officers knew based on their training and experience was consistent with narcotics trafficking. (*Id.*). Specifically, "narcotics traffickers will often use electronic surveillance [such as] cameras to protect their residences and illegal narcotics from law enforcement and individuals that may rob them." (*Id.*).

Officers later went to the residence and conducted surveillance that demonstrated the CD had negotiated for the individual at the residence to deliver narcotics to him in the alley, and officers observed McQuillan approach the CD's vehicle in the alley behind the residence. (*Id.* at

---

[10]     To the extent McQuillan challenges probable cause to support the search warrant on the ground that the CD was not reliable, the Court finds this argument unpersuasive for the same reasons described above with respect to the Court's analysis of whether officers had probable cause to arrest McQuillan. *See supra* Part III.A.1.b.

5). McQuillan was then arrested and a search of his person uncovered "a large amount of

bundled [United States currency] in both of McQuillan's" pockets. (*Id.*). Finally, officers had

information, based on a previous arrest of McQuillan, that connected McQuillan to the upper

unit, 3838 Portland Avenue South. *See* (*id.*). Officers therefore believed that the lower unit

address, 3836 Portland Avenue South, was being used to disguise the true narcotics storage

location.[11] *See* (*id.*).

Considering the totality of these circumstances and drawing reasonable inferences

therefrom, the redacted search warrant application demonstrates that the likelihood of finding

evidence of a crime at 3838 Portland Avenue South was fairly probable and was therefore

sufficient to establish probable cause to support the search warrant.[12] *See Chrobak*, 289 F.3d at

1046; *Summage*, 481 F.3d at 1078; *see also Johnson*, 2007 WL 1501301 at *9–10 (concluding

---

[11]      The search warrant application states that "[o]fficers entered the 3838 unit based upon McQuillan being arrested in July of 2014 for a warrant by the Minneapolis PD." *See* (Gov't's Ex. 1 at 5). While not specific as to the nature of the connection, when evaluating the warrant with a common sense approach and when reading this information in context, it is clear that July 2014 warrant and arrest connected McQuillan to the 3838 unit. *See* (*id*). Thus, the search warrant application presented information connecting McQuillan to 3838 Portland Avenue South and 3836 Portland Avenue South, as the warrant application demonstrates that McQuillan responded to the CD's knock at the front door at 3836 Portland Avenue South. (*Id.* at 4–5). For this reason, any lack of clarity in the record regarding what information officers received with regard to either specific address at the Portland Avenue residence does not impact the Court's probable cause determination.

[12]      For the first time on reply, McQuillan states that the CD stated that McQuillan "always came out of his garage with the drugs for the transaction" but that while under surveillance "McQuillan came out of his house not the garage and went directly to the vehicle." (Reply at 3). McQuillan then states that "[i]f officers believe [sic] the drugs were always in the garage then the search warrant should have only been for the search of the garage not the house also." (*Id.*). While it is not clear from the record that McQuillan did in fact come directly from the residence, McQuillan's argument that the CD told officers that McQuillan always came out of his garage is contrary to the record. The search warrant application states that "Junior" would "exit from the garage **or fence** for this address with the requested crystal methamphetamine." (Gov't's Ex. 1 at 3) (emphasis added). If McQuillan sometimes entered the alley by exiting through the fence, it is reasonable to assume that he may have come from the residence when conducting transactions with the CD in the past, which sufficiently connects the residence to narcotics-trafficking activity.

that search warrant for defendant's home was supported by probable cause when officers received tip from reliable informant that defendant was dealing drugs, which informant had recently seen in inside the home, and that defendant transported drugs in vehicle, and where officers observed defendant "engaging in unusual driving behavior" and discovered illegal drugs in his vehicle). Because the allegations in the search warrant application, even after redacting references to information officers gained based on their initial entry, are sufficient to establish probable cause, there is no basis to suppress evidence. *Johnson*, 2007 WL 1501301 at *10 ("Though the original warrantless entry into [defendant's] residence was not justified by exigent circumstances, officers then procured a warrant and acquired a lawful right to evidence there. For this reason, evidence from the original improper entry also need not be suppressed."); *see also Khabeer*, 410 F.3d 477 ("The independent source doctrine provides that evidence initially discovered during an unlawful search, but later obtained independently through activities untainted by the illegality, may be admitted into evidence.").

McQuillan also challenges the search warrant under *Franks v. Delaware*, 438 U.S. 154 (1978), but these challenges are unsuccessful and have no effect on the above determination of probable cause. *See* (Mem in Supp. at 5–10); (Reply at 3–4).

Pursuant to *Franks*, a defendant may challenge the veracity of the affidavit offered in support of probable cause. *See United States v. Sundby*, 186 F.3d 873, 876 (8th Cir. 1999). "To warrant a hearing on the affidavit's veracity, the defendant must make 'a substantial showing that the affidavit contains intentional or reckless false statements and [that] the affidavit, [if] purged of its falsities, would not be sufficient to support a finding of probable cause.'" *Id.* (alterations in original) (quoting *United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir.

1997)) (citing *Franks*, 438 U.S. at 155–56). The substantial showing required for a *Franks*

hearing "is not easily made." *United States v. Engler*, 521 F.3d 965, 969 (8th Cir. 2008).

McQuillan appears to raise *Franks* issues with respect to the following information

included in the search warrant application: (1) the discovery in plain view of suspected

methamphetamine in the duffel bag; (2) the detection of the odor of marijuana in the residence;

(3) the CD's statement that McQuillan approached the vehicle and "asked how many pounds [the

CD] wanted again"; and (4) "information that a drug transaction had taken place." *See* (Mem. in

Supp. at 8–9); *see also* (*id.* at 7) (stating that the "duffle bag containing the drugs was not in

plain view and not open").

As to the first two statements, any *Franks* issues are mooted by the fact that the Court has

found probable cause even after redacting information regarding the duffel bag and the odor of

marijuana from the search warrant application pursuant to the above independent source

analysis. *See supra*. The Court notes, however, that McQuillan has made no showing—let alone

the substantial showing required for a *Franks* hearing—that these statements were intentionally

or recklessly false. There is no factual support for McQuillan's assertion that the duffel bag was

unopened and/or that the suspected narcotics were not in plain view. *See* (Tr. at 56) (Officer

Fletcher's testimony that when he entered the southwest bedroom the closet door was open and

the duffel bag was open); *see also* (*id.* at 74–75) (Officer Olson's testimony that the duffel bag

was open "so you could clearly see into it").[13] And the mere absence of testimony regarding an

odor of marijuana in the residence does not by itself constitute a substantial showing that the

statement in the warrant was false. There was no testimony that officers did **not** detect an odor of

---

[13]     Nothing in the Feldmann Affidavit contradicts the officers' testimony or supports a
factual finding that the duffel bag was unopened or that the suspected narcotics were not in plain
view at the time officers entered the southwest bedroom. *See generally* (Feldmann Aff.).

marijuana in the residence; indeed, no witness was examined regarding this issue. *See generally* (Tr.).

McQuillan also fails to make a substantial showing of falsity with respect to the inclusion in the warrant application of the CD's statement that McQuillan approached the vehicle and "asked [the CD] how many pounds he wanted again." *See* (Gov't's Ex. 1 at 5); (Mem. in Supp. at 8–9); *see also* (Reply at 3). McQuillan appears to suggest that because Officer Nybeck knew that McQuillan spoke to the CD for only "a second or two" when he approached the CD's vehicle in the alley, (Tr. at 35), it was "impossible" that McQuillan and the CD actually had the alleged exchange and that Officer Nybeck therefore should not have included this information in the search warrant application. *See* (Mem. in Supp. at 8–9); (Reply at 3). The Court is not persuaded, and finds nothing implausible about the notion that McQuillan uttered a few words to the CD about how many pounds the CD wanted in a second or two.[14]

Finally, to the extent McQuillan bases his *Franks* challenge on his assertion that "the search warrant was obtained by relying on information that a drug transaction [between McQuillan and the CD] had taken place when one never did," the record does not support this challenge. The search warrant application does not state that a drug transaction took place; rather it recounts the information provided by the CD, the CD's efforts to arrange a narcotics deal with "Junior" through his communications with Taylor, the CD's apparent success in arranging the deal, and the fact that "while it was anticipated that McQuillan would be bringing the requested two pounds of crystal methamphetamine" to the CD, he did not and instead approached the CD's

---

[14]     McQuillan also contends that because it is "impossible" that he asked the CD how many pounds of methamphetamine the CD wanted in one or two seconds, the CD's credibility is "severely compromised." (Mem. in Supp. at 8–9); *see also* (Reply at 3). For the same reasons identified above with respect to McQuillan's *Franks* argument, the Court finds this argument unpersuasive and concludes that these facts do nothing to undermine the CD's credibility. *See supra* Part III.A.1.b.

vehicle to ask the CD "how many pounds [he] wanted again." (Gov't's Ex. 1 at 4–5). The Court finds that nothing in the application for search warrant gave an intentionally or recklessly false impression that a drug transaction was carried out to fruition, as McQuillan's briefing seems to suggest.[15]

In sum, McQuillan has failed to make "'a substantial showing that the affidavit contains intentional or reckless false statements.'" *Sundby*, 186 F.3d at 876 (alterations in original) (quoting *Kennedy*, 131 F.3d at 1376) (citing *Franks*, 438 U.S. at 155–56). As result, none of McQuillan's *Franks*-based challenges justify striking any information from the search warrant application, and the Court's above conclusion as to probable cause stands.[16]

### B.     Motion to Suppress Statements

McQuillan also filed a Motion to Suppress Statements, in which he "moves the Court . . . for an Order suppressing as evidence . . . any statements made by the defendant because they were made pursuant to an unlawful detention, without first being give [sic] a Miranda Warning, and/or are a result of an unlawful search of his person and property." (Mot. to Suppress Statements at 1).

The Court advised McQuillan at the hearing that the Court "will only make a report and recommendation based on the issues addressed in the post-hearing briefing." (Tr. at 8); *see also*

---

[15]     To the extent McQuillan argues that because the CD was not reliable, the Court should treat as false statements in the warrant that suggest that **an arrangement** for a drug transaction (as opposed to an actual, completed transaction) had occurred, McQuillan's argument is disposed of by the Court's earlier conclusion that the information provided by the CD was sufficiently reliable. *See supra* Part III.A.1.b.

[16]     Because the Court finds that the search warrant, even if redacted, is supported by probable cause, it is not necessary to determine whether officers had a good faith basis to execute the search warrant. *See United States v. Leon*, 468 U.S. 897, 922–23 (1984); *Mims*, 567 F. Supp. 2d at 1072 (noting that finding probable cause to support search warrant rendered good-faith-exception argument moot); *see also* (Mem. in Opp'n at 20–21) (addressing applicability of the good-faith exception).

(*id.* at 80) ("I am only going to decide those issues that are presented to me in a post-hearing brief."). McQuillan's post-hearing briefing does not identify any statements that he made that might be the subject of his motion, nor does his briefing provide any legal argument regarding the Motion to Suppress Statements. *See generally* (Mem. in Supp.); (Reply). Thus, the Court has no facts or law upon which to base any evaluation of McQuillan's vague assertions in his Motion to Suppress Statements. Therefore, the Court recommends denying the Motion to Suppress Statements without prejudice.

## IV.   RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.   Defendant Brian Peter McQuillan's ("McQuillan") Motion to Suppress Physical Evidence [Doc. No. 25] be **DENIED**;

2.   McQuillan's Motion to Suppress Evidence Based on the Search Warrant [Doc. No. 33] be **DENIED**;

3.   McQuillan's Motion for a *Franks* Hearing [Doc. No. 44] be **DENIED**; and

4.   McQuillan's Motion to Suppress Statements [Doc. No. 26] be **DENIED without prejudice**.


Dated: November 23, 2015

s/Steven E. Rau
STEVEN E. RAU
United States Magistrate Judge

**Notice**

Filing Objections: This Report and Recommendation is not an order or judgment of the District Court and is therefore, not appealable directly to the Eighth Circuit Court of Appeals.

Under D. Minn. LR 72.2(b)(1) "a party may file and serve specific written objections to a magistrate judge's proposed findings and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after objections are filed; or (2) from the date a timely response is filed.